Good morning, your honors. Elwood Louie on behalf of Weir, the appellants. I'd like to reserve five minutes for rebuttal, your honor. May I do so? Because the district court denied summary judgment on the two elements of trade dress that were an issue, secondary meaning and confusion, the sole issue on appeal in this case is whether or not the district court erred, including that the outer or the exterior configuration of the Weir pump was functional. Respectfully, we believe that the trial court made two errors. First, it applied the wrong legal test of functionality. Under Klick's billiards, the district court held that the functionality must be determined for the trade dress as a whole and not on a feature-by-feature basis. Now, what happened here in this case was the district court, we believe, misread the Letterman decision by giving no benefit and by ignoring key language in that decision, and I'll point that out. So are Letterman and Klick the kind of the range of the spectrum of cases here? Is that those are the two key cases to focus on? Well, I think also DISCOF, and the reason why DISCOF is important, it lays out the four factors that the court considers in terms of functionality, and those are, first, utilitarian advantage, and we believe the court functioned. The trial court concentrated only on that feature. But there are two other factors, three other factors that are important, other alternative designs. Did advertising tout the trade dress? And finally, the fourth one, is there a simple or an expensive method of manufacture here that's involved? This court's decision in International Jensen holds that not one factor is dispositive, so you have to look at all four, and the court clearly gave... Is it your contention that there are tribal issues of fact on these factors? Functionality, yes, absolutely. What is the basis for the factual dispute? I mean, where is the factual dispute, and what's the evidence that supports the contention that there's a factual dispute? Well, first of all, we have to go back to Letterman. In Letterman, what the court read was, it is crucial that we focus not on individual elements. Sorry. The Letterman case said, the Letterman is correct that the trade dress must be viewed as a whole. So we think the court dissected the features and looked only at functionality. And here's what the court did not consider and deleted in its opinion. But where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, then it picked up its somatic trickery to say that there's still some sort of separate overall appearance. The factors are as follows that are key to this case. One, Weir has had a unique trade dress that it has adopted and had for four decades. The five configurations that we pointed out, the base, the trapezoidal base, the shape of the base, the intern feet, the emphasized gap. But if you look at each one of those features that are in dispute, the feet, the smooth design, the bolts, the trapezoidal feature of the stand, is it your contention that there's a factual dispute over whether or not they have functionality? Yes. Or is the evidence so insufficient that no trier fact could conclude that they have functionality? Well, there was conflicting evidence, Your Honor, on a whole basis. The court said that Weir did not present evidence whether these five features in combination had no functionality, and that's incorrect because we did present it, and I'll demonstrate to that. Atlas presented no evidence on this point. Now, let's take a look at the features that demonstrate as a whole the utilitarian advantage. One under this scoff, you test whether or not there's an essential element of the feature that's important. Now, these functions that Weir presented evidence on were incidental. They were not essential. The base, of course, has a base that supports the pump. The feet reduce the footprint. The smooth casing was easier to manufacture. The bolt lobes hold the casing together. But don't all of these factors or elements that you suggest are trade risks, aren't they there just to make the pump work better? No, it doesn't do anything with the pump. In fact, where the evidence demonstrates that is, and I call your particular attention to four pages in the transcript, SCR 52 to 55. And what Mr. Cuffell, the president of Atlas, says, you need a volute, you need an impeller, you need a drive, you need a belt, and you need a nozzle. That's what moves the slurry through the pump. The features we have in our trade desk do not move slurry through the pump. Just take, for example, the trapezoidal stand. Doesn't that provide support that's essential to the operation of the pump? But they're all alternatives, and that's why you need to get to the other disc-off features. Thirteen manufacturers produce 23 pumps that don't use this trapezoid shape. In fact, do not incorporate any of these features. When you take in the other disc-off elements... you know, to a cement floor, for example. I'm sorry. So not only do you have the trapezoidal feature, but it's anchored by feet that turn inward that allow for bolts to bolt the pump to a cement base, you know. Right. Well, the footprint is not part of our trade desk. The inward-turned feet certainly are. But there are other ways to do it. In fact, that's why under disc-off, if you look at the alternative features available, 13 manufacturers had other pumps, 23 other pumps that did it in a different way. In fact, Atlas is the only one that identically copied these features. And that's our point, when you have alternative advantages. And these feet don't make the slurry move through the pump. Mr. Cuffell, in his testimony that I was getting into, went through between these pages, 52 to 55, S.E.R., and said, here's what makes the pump move. When it got down to talking about our trade dress feature, the ultimate question was, there's nothing about the shape of the cartridge assembly that moves slurry through the pump. Not that I can think of. He contends, he contends that individually these features don't work. But collectively, as you did in Rachel, as the court did in Letterman, as the court did in TYTAC, it looked at these features in combination, in whole, and determined that they had a purpose that was essential to the pump. And because there were no other alternatives. And our testimony that was conflicted was whether or not it was expensive enough. Our testimony from our witness, Grenisa, and I have a little trouble pronouncing his name, is that this is the most complicated way we could have made it. And it is more expensive. It moves you away from the functionality test, which in the law has been put in place to balance competitive innovation with the competitive necessity for the benefit of the public. And again, in these cases where you talk about Letterman, those unique features which the court said were an engineering necessity to make it like it was, made it functional as a whole. You start out by mentioning Click Billiards. And I guess Fuddruckers is similar. Yes. Don't those cases deal, you know, with a design? The trade dress and the restaurant. Yeah, trade dress design. Isn't that different than what we're dealing with here, which is a product? It may be different in a different setting, but the court has never, the Supreme Court or this court has never articulated a different test for these features. And you walk into a restaurant and it has a certain feel, a certain ambience, based upon the coloring of the tables, location, the way things are displayed, and you get a feel based on the overall design. Right. Is that the same with the pump, which is, you know, pretty utilitarian? Well, I'll tell you why. These pumps, these large pumps, maybe smaller, fit in a mine. And the shape of the pump identifies a weird pump. And as we put it in our testimony, 85% of the people who looked at a picture of a pump, a weird pump, said it's a weird pump. Eighty-six, 85% of the people who looked at a picture of an Atlas pump said that's a weird pump. So we've proven confusion, we've proven secondary meaning because of the shape. The question is functionality, and I submit to you there's no evidence in the record, and the court says that because we can't point out. I've done it the other way. I've shown you as a whole why we have evidence. Let me give you an example. One of the four factors does advertising tout the trade dress. There's no, nothing in the Atlas or in the weir that touts this trade dress. Well, that goes, and the court said that was neutral. That is not neutral. The absence of any portion of the Atlas advertisement that does not, does ignore trade dress shows the non-functionality. Let me ask you this. Is that, the statement of the court that that was neutral, is that a legal conclusion or is that a factual conclusion? That's a factual determination, Your Honor. In fact, this court concludes. Why is that a factual determination? The court's just saying, well, it's just neutral here. It doesn't really mean anything. Why is it factual? Yeah, why is that factual? Well, first of all, as the court said in Qualitas, the feature has to have some essential purpose, and the reason the consumer buys this product is that it's pump slurry. It doesn't buy it for the feet. It doesn't buy it for the emphasize gap. This is equivalent to the package or box. It might buy it because it's stable. It's stable? Yes. The trapezoidal feature makes it a very stable product. But that's not the only way you can do it. Under Disc Golf, because there are alternative designs, there's 13. In fact, our witness, Morrow, did one other thing. He took our pump and gave it another trade dress. And as the court said, it's hypothetical. But under Clamps, this court said you can look at hypotheticals. But you don't have to look at hypotheticals in our case because we have 13 manufacturers that produce 23 different pumps that work that do not have the trade dress. So when the court is concerned about functionality, it balances the producer, the inventor's protection of its unique invention versus the consuming public's need for competition. Here, there's other ways of making it, and that's why Disc Golf tests alternative designs, cost of manufacture, ease of manufacture, and functionality are important. And the functionality, is it essential? Not that it has a function. But didn't Judge Zille take into account the alternative aspect? He did not. He said, once I get the functionality, that's it. He didn't consider the alternatives. He did consider the alternatives in this respect, Your Honor. He said that the 13 manufacturers, because we could not prove marketing and sales figures, was speculative. And Your Honor can well imagine, the competitors do not necessarily We would not know the marketing and sales data for our competitors because it may be a matter of industry confidence and secrecy that we would not have. We couldn't have that data. But we have not speculative issues. We have 13 manufacturers that produce 23 pumps, and they're in the record. There's pictures of them, and they do not have the trade dress. So we have here what functionality design detects. On the functionality balancing test, we have the consumers on one hand, which is the purchase of these pumps, and we have the inventor on this side. For 40 years, we protected, we changed the inside of the pump, but never changed the exterior look because that was our secondary meaning. Over 40 years, as the court in Wal-Mart said, we've acquired the secondary meaning of this shape and design that when someone goes to a mine and sees a pump, they think it's a weird pump. Well, when we're shown a picture, the Sable survey shows that 85% of people thought they were looking at a weird pump when it was an Atlas pump. But this is not a passing-off case, is it? No, it is not a passing-off case. And I think it's important that one of the things you look at functionality and what the court is concerned about in protecting the consumer and competition is that we are, unlike the case in TYTAC where there was an expired patent or Leatherman was an expired patent, we have not ever attempted to get a patent on the trade dress. So there's not any issue about extending a monopoly on trade dress, but there is a need to protect it if there are alternatives, if it's more costly to manufacture our product, if the advertising does not tout it. This Dyskoff case lays out the four tests, and I repeat myself, Your Honor, Judge Zille focused primarily on the functionality test. He said this case, it was a troubling thing to him, that it was a matter that the Ninth Circuit and why we're here will have to deal with. He said there's no one case on point. Where I differ with Judge Zille is in this respect. I think the existing law does give the framework to make a decision, first on the issue of trade dress, and secondly, obviously, on the summary judgment ruling. We presented evidence, and no one else presented evidence, on trade dress as a whole. On the features that the evidence was in conflict, there's a conflict of whether or not the features were essential to moving the slurry through the pump.  I urge you to look again at S.E.R. 52-55. Mr. Koeffel, the president of Atlas, said it doesn't help move the slurry through the pump, which is essential, which under the Inward Laboratories case, the Supreme Court said it's not essential to the pump. Yes, you have to have feet. Yes, you have to have a base. But our kind of base, our kind of feet, when there are alternatives, I think that's important. Counsel, thank you very much. Your time has expired. Oh, thank you. We'll hear from the other side. May it please the Court, Your Honor. Larry Graham for the Atlas Entities. I'd like to take up the arguments generally in turn, if I may. And the initial argument that we were presented was that Judge Zillebloh applied the wrong test and did not look at the trade dress elements as a whole. We would submit in a general way, this is a very difficult thing to do analytically. If you look at this Court's jurisprudence, I don't think this Court has ever done that, mainly because intellectually, how do you do it? If you look at Leatherman, Disc Golf, Tytech, Rachel, you have to analyze the features one at a time. The Court never then stepped back and said, well, now that we've looked at them individually, let's look at them as a whole. But even if you did, in this case, it is undoubtedly Weir's burden of proof on functionality. If this must be looked at as a whole, Weir didn't do it. We presented evidence individually and followed this Court's jurisprudence in Rachel and Tytech and Leatherman and said, look, if you find functionality individually for these features, it's semantic trickery to go on and look at it as a whole. We believe that's sufficient to stop there. But if it's not, the Court must remember that it is Weir's burden to do that. I mean, was there conflicting evidence on the functionality issues? No, Your Honor, I don't believe so at all. That's the one thing that, you know, you read Judge Zillie's order and it almost reads like an order after a trial. He did canvas the evidence. I don't think that that means there's conflicting evidence. Here's how I would suggest the evidence stacks up. He didn't say that there are no material factual issues in dispute. He didn't say that. I agree, Your Honor. He said there isn't enough evidence here that the party with the burden of proof on functionality could prevail. Sure. If I may, Your Honor. Yeah, I'm just wondering if he went too far. That's the only thing that really bothered me about it. I don't think that he weighed the evidence. I think that if you start with this Court's approach, the four factors from Dysgolf and so on, that has four things you look at for functionality, the first and the fourth of those two deal with the product, the feature itself, and what it does in the product and manufacturing, whether it's cheaper to make it. On those two factors, we would submit that Atlas submitted evidence from Mr. Koufoul and from an expert saying, look, these things perform specific functions. They make it work better. They make it cheaper to make and so on. And we would submit that on that level, that evidence of those two factors is undisputed. Now, Judge Zillie canvassed it. He explained what it was, but there was no dispute about it. What about Mr. Louie's point that these features have nothing to do with moving the slurry through the pump? Sure, Your Honor. I was not quite finished with the first question, but should I answer this question? Go ahead, Ant. Just work them together. They go together. Absolutely, Your Honor. Judge Zillie called this the slurry pump's pump slurry argument. We would suggest that analytically it falls apart. I mean, if you took away the pedestal and the bolts and the casing, then you have this impeller that's just going to slop around and spray anywhere. It can't pump slurry. Even using that articulation of does it move slurry through, it can't without the other pieces. But this product is, of course, designed to pump slurry, but it also to work for a consumer to buy it for that purpose. It has to be stable. It has to be sturdy. It has to be bolted to the floor. It has to sustain the pressures. All of these components, every single one of them, performs a specific function that helps this product to work better. You take any one of them out of the mix and the product simply doesn't work, not only not work better, it doesn't work at all. And Lou Kufel absolutely did say in his deposition, he said, sure, these other things, the bolts and the pedestal, they don't move slurry through the pump. But it's a little bit out of context to say, therefore, he admitted that they're not functional, because as Arbery argued, right after that, there were some questions asking about these specific trade dress components in which Mr. Kufel articulated very clearly and at length what they were doing, how they were functioning, how they make it stable, the pressures of the impeller as it's spinning through the pump make huge vibrations, because there's sand and gravel and things of that sort. So you need a very stable base, and it has to be firmly mounted to the floor. Otherwise, it would shake itself to death in a matter of seconds or minutes. So all of those things are performing very specific functions. And to return to your question, if I may, Your Honor, so on the first and the fourth factor from this gulf, that was the nature of the evidence, and it was undisputed. It's the second and third factors dealing with alternatives and advertising where perhaps the evidence was different. It wasn't a matter of undisputed. So what we have in terms of advertising was the notion that there is no advertising touting these features for their utilitarian or for their aesthetic attributes for that matter. We would submit that the absence of such advertising says nothing at all about whether it's functional or not. One cannot bootstrap himself into proof of functionality by demonstrating the absence of evidence that might purport to show functionality. At most, we would have to say that the absence of anything that speaks to these features in advertising would not raise a genuine issue of material fact. If it did, this Court would always be faced with the proposition of never being able to affirm a summary judgment if there is no advertising at all on a product, hardly a good position to be in. But in view of the compelling evidence of the features and benefits and manufacturing advantages, it can't create a genuine issue. How about the alternative designs? That brings us to the alternative. Is that a little bit more difficult? Yes, Your Honor. That's probably the stickiest point because there was some evidence of alternatives here. There are two main issues that we would submit resolve the question of alternatives. First, in our view, in accordance with traffics and the Supreme Court's guidance, once this Court reaches the position that the other factors demonstrate utilitarian advantages of the trade dress, the Court need go no further. It doesn't matter if there are alternatives that can also do the job. And so we would suggest you stop right there. Now, after traffics, this Court has said that it may sometimes look at alternatives as a way of evaluating, in the first instance, whether these things are functional or not. We're not quite sure how that really meshes with traffics. We think the plainer reading of traffics is the Court really must stop. Are you contending that Judge Zille considered alternative designs in any event? He did look at them, Your Honor. He gave we're the benefit of looking at the alternatives, and he evaluated what they were on their merits and whether they could overcome it. For his part, what Judge Zille said is that if I'm going to consider alternatives, I need some pretty beefy evidence to overcome the other factors, and I need to know that these are things that actually are alternatives. And that means they're things that consumers will actually buy, that perform the same job, that do it just as well, that have the manufacturing advantages that were presented in the other factors. Here what we have is what this Gulf Court called a motley assortment of alternatives. Here are some images of other pumps that are on the market. The ones that are actually on the market, we don't know what those are doing. Are they pumps that have motors that are just as strong? Do they produce pressures that are just as high? Do they cost the same amount of money? Are they as easy to make? We don't know any of those things. All we know is here are some other things. Then we have Mr. Morrow's, his ones that he made up, his designs that he came up with. We don't know anything about those either. Would consumers buy those? They're not real. We don't know how sturdy they would be, whether they can withstand the same thing, whether they can be made at the same cost effectiveness. We don't know any of those things about all of those. So we would submit that even if you go farther, you would not look at those alternatives and say they create a genuine issue. This court has done the same thing. In fact, I believe this court has done it every single time. There were alternatives present just the same way in Rachel, in Tytech, in Leatherman, in Disc Golf, in Talking Rain. All of those cases had the presence of alternatives. Yet in every one of those cases, the court found that there was not a protectable product configuration trade dress. The other factors are compelling, and they're compelling here as well. Once you get to this point where these features are shown to have advantages in the performance of the product or ease of manufacturing, the court need to go no further. And we submit that's what the court should do here too. If I might, Your Honor, I'd like to turn briefly to the issue of the attorney's fees that we submitted. Beyond the trade dress at issue here, there were several other causes of action submitted below. There was one in particular dealing with reverse passing off, and as we generally set forth, originally we argued that Atlas's pumps were originally Weir pumps and that we were scraping off the labels and passing them off as our own. We believe that there was never any evidence that Weir ever could possibly have been in possession of that would have established that. And in fact, as the manufacturer of its own pumps, there were indicia that it should have been aware of at all times to know whether it made those pumps or we did or someone else. We were forced to go through an awful lot of discovery to prove that. We, Atlas, as the defendant, nominal plaintiff, but defendant in this claim, didn't know what to look for to prove. We didn't know how. Yeah, but this is not an exceptional case, is it really? Your Honor, well. You're marching uphill on this one. We would concede that that's the case, at least in terms of jurisprudence. It's not very often that the court has found such a thing to be exceptional. What we would say is that the articulation of what is an exceptional case includes a variety of things, one of which is a case that's groundless, and this is it. This case never had any evidence from the get-go. If the court does not find a case of this sort that's groundless from the beginning to be exceptional, then the court should change its articulation of what an exceptional case is. Strike it. Get rid of it. Are you also arguing FRAP 38? I'm sorry, Your Honor? Are you also arguing FRAP 38? FRAP 38 on appeal? No, Your Honor, not for that, no. In this case, in terms of the attorney's fees, this is also a very unusual instance of it. It's not a matter of an argument that we simply won on summary judgment and we're arguing we shouldn't have had to go that far. It's a very rare instance where a summary judgment motion is filed and the other side doesn't address the cause of action in its brief and concedes on oral argument that it's not even going to contest the issue. Meanwhile, we're working hard preparing the case. We have to to prove it. What should have been done was when we recognized that it was a groundless case, we should have told us and should have dropped the case, taken steps to remove it from the action without requiring us to go that far. Unless there are further questions, Your Honor, I'll cede my time. No further questions. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn. Hear ye, hear ye. All persons having had business with the Honorable Judges of the Attorney's Court of Appeals of the Ninth Circuit will now depart. For this court, this session now stands adjourned.
judges: Beezer, O'scannlain, Paez